**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **KEY STAR PARTNERS, LLC,** *Plaintiff,* <br><br> v. <br><br> **INSIGNIA DISPOSAL SERVICES, LLC,** *Defendant, Counter-Plaintiff, Third Party Plaintiff,* <br><br> v. <br><br> **MICHAEL A. HREBNAR, et al.,** *Third-Party Defendants.* | **CIVIL ACTION NO. 22-2338** |

**MEMORANDUM OF DECISION**

BAYLSON, J.                                                                            **April 12, 2022**

## I.      INTRODUCTION

This case began as a simple breach of contract action but a counterclaim and third-party complaint have made it more complicated.  Plaintiff Key Star Partners, LLC ("Key Star"), is a Texas company in the waste management business.  Key Star owns the company Tire & Rubber, Inc., or TRI, which operates a waste storage facility located in West Virginia.  Sometime in March 2021, Key Star agreed to sell TRI in a cash-for-stock transaction to the Defendant, Insignia Disposal Services, LLC, ("Insignia") another waste management business based in Wayne, Pennsylvania.  As part of the Stock Purchase Agreement ("SPA"), Key Star alleges that Insignia agreed to pay Key Star two potential earn-out payments of $300,000, each based on TRI's meeting certain productivity targets halfway through and at the end of the year following the stock purchase and leading up to the SPA's closing date.  Key Star alleges that it eventually was entitled to both earn-out payments under the conditions of the SPA and while it did receive

1

the first earn-out payment, Insignia failed to transmit the second payment, prompting this lawsuit for one count of breach of contract.  <u>See</u> Complaint (ECF 1).

In response to Key Star's claims, Insignia filed counterclaims against Key Star alleging that Key Star had made misrepresentations about the condition of the TRI facility and its compliance with state and federal regulations, claiming:

(1) One count of breach of contract,

(2) One count of indemnification,

(3) One count of securities fraud under Section 10b-5 of the Securities Exchange Act of 1934, and

(4) One count of common law fraud.

Insignia has alleged that in between the parties' entry into the SPA in March 2021 and the TRI transaction's closing in September 2021, Key Star engaged in a series of business actions at the TRI facility intended to maximize production outputs for Key Star while leaving Insignia with the ensuing operating costs and other consequences.  These alleged actions included accepting improperly disposed waste, placing business and environmental permits in jeopardy, ceasing routine maintenance of the facility, failing to take action to make proposed improvements to the facility, illegally over-charging customers and failing to comply with federal employment regulations.  Insignia alleges that Key Star was motivated to meet the output levels required to attain the earn-out payments under the SPA.

Within two weeks of Insignia filing its counterclaims, Insignia also filed a third-party complaint against all five of Key Star's individual shareholders (the "Shareholders") alleging losses due to the misrepresentations about the TRI facility:

(1) One count of indemnification, and

(2) One count of securities fraud under Section 10b-5 of the Securities Exchange Act of 1934, assigning personal liability under Section 20(a)'s "controlled person liability" theory.

Before the Court are Key Star's and the Shareholders' Motion to Dismiss Insignia's counterclaims and third-party complaint.  For the reasons set forth below, the Court will deny the Motion as to Insignia's counterclaims and will grant the Motion without prejudice as to Insignia's third-party claims.

## II.    <u>JURISDICTION</u>

This Court has subject-matter jurisdiction to hear this case under 28 U.S.C. § 1332 (diversity jurisdiction) because the parties are in complete diversity—the Plaintiff and Third-Party Defendants all reside in Texas and the Defendant resides in Pennsylvania—and the alleged amount in controversy exceeds $75,000.

## III.    <u>ALLEGED FACTS AND PROCEDURAL HISTORY</u>

### A.  <u>Alleged Factual Background</u>

The following are the facts as alleged by Insignia in its Amended Counterclaim and Amended Third-Party Complaint:

Insignia is a waste management company with its principal place of business in Wayne, Pennsylvania.  Key Star is a business entity principally based in Texas that owns all the outstanding shares of stock in a waste management company based in West Virginia called TRI. TRI owns and operates a long-term, temporary waste storage facility—colloquially, a landfill—for scrap tires and construction/demolition waste located in West Virginia.  The Key Star Shareholders, Michael A. Hrebenar, James M. Hrebenar, Brad A. Hrebenar, Edward A. Hrebenar and David Marino, together own 100% of Key Star.

3

On March 31, 2021, after arms-length negotiations, Insignia entered into the SPA with Key Star, agreeing to purchase all outstanding shares in TRI from Key Star in exchange for $4.1 million in cash.  See Ex. A, Amended Counterclaim ("SPA Doc.") (ECF 1-1).  The SPA included several sections of representations and warranties made by Key Star regarding TRI's financial condition and the condition of the landfill, including a full disclosure of events that could have a "Material Adverse Effect" as defined by the contract and a representation that the landfill is not in need of any maintenance aside from "routine maintenance and repairs that are not material in nature and cost."  SPA Doc. at 23-24, 25.  Key Star also represented in the SPA that TRI "has complied, and is now complying . . . with all laws applicable to it or its business, properties or assets" and "with all Environmental laws in all material respects."  Id. at 22-23. Insignia represented at oral argument before the Court on April 4, 2023, that it and Key Star engaged in extensive negotiations prior to signing the SPA, during which agents of Key Star expressed the warranties and representations reflected later on in the SPA.

Also, as part of the SPA, Key Star agreed to continue operating TRI until the transaction's Closing, specifically representing in the SPA that Key Star would "conduct the business of [TRI] in the ordinary course of business consistent with past practice."  SPA Doc. at 35-36.  The SPA provides that Key Star may receive "earn-out payments" in two installments of up to $600,000 if, during a specified time period between signing and Closing, TRI's waste tonnage met certain targets.  Id. at 16-17.

Importantly, the SPA included sections on indemnification that instruct Key Star to "pay and reimburse" Insignia for "Losses incurred" due to "inaccuracy in or breach of any of the representations of warranties of the Seller."  SPA Doc. at 45.  These "Losses" would be "offset" by any earn-out payments due to Key Star.  Id. at 48.  The indemnification sections of the SPA

also provide that, except in regards to claims for equitable relief or fraud, "[f]ollowing the Closing . . . the rights to indemnification . . . shall be the sole remedy that any Indemnified Party will have in connection with the transactions under this Agreement." Id. at 50.

Closing occurred on September 3, 2021.

Insignia's claims against Key Star and the Shareholders originate from the Movants' alleged conduct before and during negotiations and after signing the SPA related to their representations regarding the financial, physical and regulatory condition of the TRI facility and their conduct in operating the facility post-signing.  Insignia's allegations of breach and misrepresentation can be summarized as follows:

- **<u>Failure to Maintain Sufficient Airspace:</u>**  Insignia alleges that sometime after signing, TRI began to significantly increase its tire waste intake and airspace usage without correspondingly increasing its cell space availability, inconsistent with past practice.  Insignia alleges that a part of the ordinary operation of such a landfill requires maintaining sufficient airspace for anticipated waste intake, and that TRI's failure to do so reflected its goal to meet the earn-out targets without expending capital to maintain the landfill post-Closing.  Insignia alleges that it discovered the damage from TRI's actions during inspection shortly after Closing. Furthermore, Insignia alleges that at some point prior to closing, dirt from an adjacent hillside slid into one of the landfill cells causing additional damage to viable airspace, and which TRI did not elect to fix before control was ceded to Insignia.  Insignia represented at oral argument that it has spent money on airspace construction to deal with this issue.

- **Environmental Regulatory Violations:**  Insignia also alleges that following Closing, it found evidence at the TRI facility of improper waste disposal inconsistent with government business and environmental permits held by TRI. Insignia alleges that it found a "brown spot" in a disposal storage cell indicating additional underground heat from a failure by the customer to separate the waste material.  Insignia alleges that after representing to the contrary during negotiations and signing of the SPA, TRI knowingly accepted non-permitted waste material to help meet the earn-out targets, exposing TRI to regulatory liability and damaging the facility.

- **Failure to Maintain Leachate Pond:**  Insignia alleges that after Closing, Insignia was alerted by West Virginia's Department of Environmental Protection that the TRI facility's leachate pond, a landfill receptacle used to collect runoff from rainwater that comes in contact with buried waste, required a corrective action plan for cleaning and maintenance.  Insignia discovered after Closing that the TRI leachate pond had not been cleaned out in eight to ten years.  Insignia alleges that Key Star did not disclose the condition of the leachate pond, the cleaning and dredging of which Insignia now estimates will cost approximately $100,000.

- **Illegal Over-Charging of Customers:**  Insignia alleges that in the period between the signing of the SPA and Closing, TRI faced a formal complaint filed by its customers with West Virginia's Public Service Commission, which claimed that TRI had illegally raised the price of its tire disposal services.  According to Insignia's pleadings, the formal complaint is still pending in front of an administrative law judge and could result in a rash of refund requests should the

judge rule that TRI's conduct was illegal.  Insignia alleges that if TRI's have

impermissible price-raising of its services during the period between signing and

Closing is inconsistent with the Movants' representations in the SPA that TRI was

in compliance with all laws and regulations.

- **<u>Failure to Disclose Existing Federal Regulatory Violation:</u>**  Finally, Insignia
alleges that prior to Closing, TRI employed an individual who had engaged in
conduct in violation of federal regulations restricting drug and alcohol use.
Insignia discovered this when the Department of Transportation notified TRI after
Closing that TRI was in violation of 49 C.F.R. § 382.501(a), which prohibits
employers from allowing a driver who violated the regulation's drug and alcohol
rules to drive a commercial motor vehicle.  Therefore, Insignia alleges, Key Star
misrepresented that it was in compliance with all laws and regulations at the time
of the signing.

Key Star and the Shareholders have together filed a Rule 12 Motion to dismiss all of

Insignia's counterclaims and third-party claims.  Movants argue primarily that Insignia's breach

of contract claim is subsumed by the SPA's "sole remedy" of indemnification, that Insignia's

indemnification claims are premature because Insignia has not alleged actual damages, that

Insignia's fraud claims are not stated with particularity and are duplicative of its breach of

contract claims, and that the Third-Party Complaint against the Shareholders was brought

improperly under the Federal Rules.

### B.  <u>Procedural Background</u>

On June 14, 2022, Key Star filed this lawsuit against Insignia, alleging that Insignia had

failed to deliver to Key Star the second earn-out payment installment totaling $300,000 that Key

Star was owed under the SPA and that Insignia was liable for a single count of breach of

contract.  See Complaint at 3.  On August 17, 2022, Insignia answered with its original

counterclaim against Key Star, which included counts of breach of contract, indemnification,

securities fraud and common law fraud.  See Original Counterclaim (ECF 8).  Insignia followed

with a Third-Party Complaint against the Shareholders on August 30, 2022.  See Original Third-

Party Complaint (ECF 10).  Key Star moved to dismiss both, after which Insignia filed an

Amended Counterclaim and an Amended Third-Party Complaint on September 21, 2022 and

October 17, 2022 respectively.  See Amended Counterclaim (ECF 15); Amended Third-Party

Complaint (ECF 20).  The Court dismissed Movants' motions to dismiss as moot, and Movants

filed this Motion on October 24, 2022.  Motion to Dismiss ("Mot.") (ECF 23).  Insignia filed its

Response on November 15, 2022 and Key Star its Reply on November 21, 2022.  Response in

Opposition ("Resp.") (ECF 25); Reply (ECF 26).  Oral argument was held before the Court on

April 4, 2023.

## IV.   <u>STANDARD OF REVIEW</u>

When deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6),

the Court must accept as true all well-pleaded allegations in the complaint and view them in the

light most favorable to the plaintiff.  See Angelastro v. Prudential–Bache Sec., Inc., 764 F.2d

939, 944 (3d Cir. 1985).  The Court may look only to the facts alleged in the complaint and its

attachments.  See Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir.

1994).  A Rule 12(b)(6) motion will be granted only when it is certain that no relief could be

granted under any set of facts that could be proved by the plaintiff.  See Ransom v. Marrazzo,

848 F.2d 398, 401 (3d Cir. 1988).

The Court recognizes that the legal citations above refer to a "plaintiff" in the role as non-movant—the Court clarifies that these holdings pertain equally to non-movant defendants who have filed counterclaims or third-party complaints in a litigation, as is the case here.

**V.**     **ANALYSIS**

   **A.  The Intra-Contractual Claims**

   **1.  Does the SPA Establish Notice as a Condition Precedent for Insignia's Claims?**

Regarding Insignia's intra-contractual claims of breach and indemnification, Movants' first contention is that Insignia's claims were improperly brought in its Counterclaim based on a provision in the SPA that required pre-suit notice of those claims, which Movants argue constitutes a condition precedent. Because Insignia did not provide notice before filing its contractual claims in the Amended Counterclaim and therefore failed to perform the condition precedent, Movants argue, Insignia's rights to damages or indemnification have not accrued and its claims should be dismissed. Insignia does not argue that it provided notice to Movants—instead, Insignia only argues that the plain reading of the SPA does not establish notice as a condition precedent for its claims and that even if it did, Pennsylvania law guides strongly against the "harsh" result of claim forfeiture.[1] Both sides respectively argue that the plain language of the SPA supports their interpretation of the notice provision.

"A condition precedent is either an act of a party that must be performed or a certain event that must happen before a contractual right accrues or contractual duty arises." <u>Borough of Moosic v. Darwin Nat. Assur. Co.</u>, 556 Fed. Appx. 92, 97 (3d Cir. 2014) (quoting 13 Williston on Contracts § 38:7 (4th ed.); <u>see also</u> <u>O'Leary v. Grace/Newark Housing Ltd. Partnership</u>, 31

---

[1] Both parties agreed, at oral argument, that Pennsylvania law dictates this action.

Fed. Appx. 784, 786 (3d Cir. 2022) ("Under basic contract law, a condition precedent is 'an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due.'") (quoting Restatement (Second) of Contracts § 224). "[W]here a condition precedent has not been fulfilled, the duty to perform under the contract lays dormant and no damages are due for non-performance." Boro Const., Inc., 992 A.2d at 215 (citing Shovel Transfer and Storage, Inc. v. Pa. Liquor Control Bd., 739 A.2d 133 (1999)).

The Third Circuit has instructed courts to interpret contractual provisions alleged to be conditions precedent by considering the context of the entire contract. See Pacific Employers Ins. Co. v. Global Reinsurance Corp. of America, 693 F.3d 417, 420 (3d Cir. 2012) ("When we read this sentence in the context of the entire Certificate, we agree with the District Court that it is fairly susceptible to only one reasonable interpretation."). "First, we must determine (as a matter of law) whether contractual language is ambiguous." Id. at 426. If unambiguous, "we follow its plain meaning"—if ambiguous, "we leave it to a fact-finder to decide its meaning." Id. "A contract is ambiguous where the contract is susceptible of more than one meaning or if it is subject to reasonable alternative interpretations." U.S. v. Pantelidis, 335 F.3d 226, 235 (3d Cir. 2003) (internal quotations and citations omitted).

Movants argue that a notice provision in the SPA constitutes a condition precedent to any breach of contract or indemnification claim brought under the SPA. Movants are referring to § 8.05(c), titled "Direct Claims," which provides details on the claims process within the "Indemnification Procedures" section of the SPA. See SPA Doc. at 47-48. Among other instructions on how an Indemnified Party may assert a direct claim for Loss, §8.05(c) provides:

> [A Direct Claim] shall be asserted by the Indemnified Party giving the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than thirty (30)

days after the Indemnified Party becomes aware of such Direct Claim.  The Failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure.

Id.

A notice provision may constitute a condition precedent affecting the rights of the claiming party in some cases, but this is not the case here.  First, it is less than clear whether the parties intended for the notice to be a condition precedent for making claims of indemnification under the SPA—the provision does not mention 'condition precedent' and does not specify the effect of failure to adhere to the notice requirement.  See Boro Const., Inc. v. Ridley School Dist., 992 A.2d 208, 215 (Pa. Commw. Ct. 2010) ("[A]n event or act enumerated in a contract will not be construed as a condition precedent unless it clearly appears to have been the parties' intention.").  In fact, and as argued by Insignia, the provision directly addresses the rights affected by failure to deliver prompt written notice and does not state that the right to the claim is forfeited, rather it states only that the rights of the *indemnifying* party may be affected.  And even if it were reasonable to construe the notice provision here as being a condition precedent, it is likely that Movants would have to show prejudice under Pennsylvania law by establishing that "substantial rights have been irretrievably lost" as a result of the claimant's failure to perform the condition precedent—and no such right has been lost by Movants here.  See Pacific Employers Ins. Co., 693 F.3d at 436 (holding as a result of an "Erie Test" that "Pennsylvania Courts would apply a must-show-prejudice rule to reinsurance contracts, even when a contract makes the notice provision an express condition precedent to coverage") (citing British Ins. Co. of Cayman v. Safety Nat'l Cas., 335 F.3d 205, 212 (3d Cir. 2003) (New Jersey's must-show-prejudice test requires establishing that "[p]rejudice in a late notice defense is determined by examining (1)

11

whether substantial rights have been irretrievably lost and (2) the likelihood of success of the insurer in defending against the victim's claim")).

Movants cite to <u>Boro Construction, Inc. v. Ridley School District</u>, a state appellate decision, in support of their contention that a contract provision does not need to specifically say that it is a condition precedent, and in fact it need only use the phrase "subject to" to connote its status as a condition precedent.  <u>See</u> <u>Boro Const., Inc. v. Ridley Sch. Dist.</u>, 992 A.2d 208, 215-16 (Pa. Commw. Ct. 2010).  But <u>Boro</u> is distinguished because the provision at issue in that case— requiring an architect to approve the acceptability of work performed on the building before final payment—was unique to building contracts and applicable to the central payment structure comprising the contract, not a remedies provision.  <u>Id.</u>  Looking at the provision in the context of the greater contract, payment structures naturally may require conditions precedent such as performance approval as part of the quid-pro-quo nature of the contract—not so for remedies structures.

The "Indemnity Procedures" outlined in §8.05 of the SPA resemble the sort of contract structure that promotes convenience between the parties and is meant to minimize costs of resolving post-Closing conflicts while describing a set of ground-rules to promote fairness within these procedures.  They do not suggest that a party's failure to adhere to every little detail of the indemnification procedures should result in the complete forfeit of any right to remedy.

### 2.  Count I:  Breach of Contract

In Count I of Insignia's Counterclaim, Insignia asserts a breach of contract claim for damages.  Insignia alleges that Key Star breached the SPA by failing to maintain TRI in the ordinary course of business between signing and Closing, evinced by the alleged problems with the leachate pond, the permit violations, and the tariff issue.  Key Star argues that none of the

conduct allegations levied by Insignia amount to breach and, even if they did, Insignia is precluded from pursuing damages because the sole remedy in connection with any transaction under the SPA is indemnification.

Key Star points to Section 8.10 of the SPA's "Indemnification" section, titled "Sole Remedy," which reads:

> Following the Closing, the parties agree that, except for the availability of injunctive or other equitable relief and claims for fraud, the rights to indemnification under Article VI and Article VIII shall be the sole remedy that any Indemnified Party will have in connection with the transactions under this Agreement.

See SPA Doc. at 50.

In its Response, Insignia only directs the Court to § 8.07(c) of the SPA, under the section titled "Maximum Payments; Remedy; Certain Limitations," which provides:

> Notwithstanding anything to the contrary set forth in this Agreement, (x) the liability of the Seller in respect of Losses (i) incurred pursuant to clauses (b), (c) and (d) of Section 8.02, or (ii) arising as a result of, with respect to, or in connection with breaches of the representations and warranties contained in the Fundamental Representations of any arising under Article VI shall be not be [sic] limited.

Id. at 49.

Insignia's suggestion is that the use of the term "liability" means not just amount of loss, but also with respect to the claim underlying the loss (breach of contract, fraud, etc…).[2] Interpreted this way, § 8.07(c) may be construed to allow for not only unlimited losses for breaches of representations and warranties contained in the Fundamental Representations of the SPA, but also unlimited types of claims asserted in pursuit of such losses.[3]

---

[2] "Liabilities" is defined in the SPA, but the definition does not clear up any ambiguity for purposes of this Motion. See SPA Doc. at 22. Furthermore, the defined term capitalizes the "L" in congruence with other defined terms used in the SPA, while the term used in § 8.07 is neither capitalized nor in plural.

[3] While not addressed by the parties, the Court interprets the obvious typo "shall be not be" to mean "shall not be," as this appears to be the clear intention of the phrase within the context of the paragraph.

Reading § 8.07(c) in the context of the entire section, however, shows how Insignia's interpretation is mistaken, and that "liability" only refers to an amount of loss, not a type of claim.  Courts may read sentences within a contract in the context of the entire contract in order to arrive at a reasonable interpretation of the sentence.  See Pacific Employers Ins. Co. v. Global Reinsurance Corp. of Am., 693 F.3d 417, 420 (3d Cir. 2012) ("When we read this sentence in the context of the entire Certificate, we agree with the District Court that it is fairly susceptible to only one reasonable interpretation.").  Preceding § 8.07(c) are § 8.07(a) and (b), which refer to the maximum allowed Losses for any breach of the representations or warranties of the SPA and any breach of the Intermediate Representations, those specified as being 25% and 75% of the Adjusted Purchase Price respectively.  See SPA Doc. at 49.  Both (a) and (b) are structured in the same manner as (c): (a) provides that Losses "shall be limited to twenty-five percent (25%), (b) provides that Losses "shall be limited to seventy-five percent (75%), while (c) provides that Losses "shall not be limited."  Read in conjunction with the other parts, (c) can reasonably be interpreted as referring only to an amount of loss being unlimited.  Therefore, (c) is not inconsistent with § 8.10; the two together read that Insignia may seek unlimited amount of Loss from Key Star for Losses arising from breaches of Fundamental Representations under the SPA, but only through the sole remedy of indemnification.  See Ludwig Honald Mfg. Co. v. Fletcher, 405 F.2d 1123, 1131 (3d Cir. 1969) ("Where ambiguity exists, the minor provision must be construed as not to conflict with the main purpose of the contract.").  It appears that (a), (b) and (c) simply comprise the "Maximum Payments" part of § 8.07, as per the title.

Still, the Court is obligated to take into account an important aspect of the case as a whole that possesses certain weight on this issue, that being the nature of the lawsuit.  Key Star, feeling that Insignia had not adhered to the parties' black-and-white bargain, sued Insignia for breach of

contract, which prompted Insignia to file an answer containing counterclaims for breach of contract.  Just as Key Star has a right to put forward its interpretation of an unclear contractual provision, so does Insignia have the right to defend its own interpretation.  Where the contract is unclear and the defendant has made a counterclaim for breach of contract against the plaintiff's own breach of contract claim, all while considering the early stage of the litigation, the Court is thoughtful toward allowing the defendant a liberal chance to defend itself and its own interpretation of the contract in the light most favorable to the non-movant.  See Pittsburgh Nat'l Bank v. Welton Becket Assocs., 601 F.Supp. 887, 891 (W.D. Pa. 1985) (citing Columbia Pictures Indus., Inc. v. Redd Horne, Inc., 749 F.2d 154, 161 (3d Cir. 1984)).

The Court will deny the Motion as to the breach of contract claim.

### 3.  Count II:  Indemnification

Insignia also brings a claim of indemnification against Key Star seeking payment from Key Star to cover losses incurred as a result of the alleged breaches of the SPA.  The indemnification claim covers the same alleged conduct specified by Insignia under the breach of contract claim, namely losses incurred for failure to maintain the ordinary course of business in the period between signing and Closing, as well as the regulatory violations.  Movants argue that Insignia's indemnification claims are premature as a matter of law.

Under Pennsylvania law, unless a loss has actually been incurred, an indemnity claim for that loss is premature.  "Claims for indemnification arise only when the party seeking indemnity has made a payment on the underlying claim. . . . Under Pennsylvania law, actual payment, and not just a verdict or judgment, is required." McClure v. Deerland Corp., 585 A.2d 19, 22-23 (Pa. Super. Ct. 1991); see also Gen. Accident Ins. Co. of Am. v. Allen, 696 A.2d 1089, 1095 (Pa. 1997) ("The question before a court in a declaratory judgment action is not whether the insurer

owes *indemnification* in a specific amount, which would be a premature inquiry absent a full resolution of the underlying action."). "It is clear before the right of indemnification arises, the indemnitor must in fact pay damages to a third party. Any action for indemnification before such payment, as in the present case, is premature." F.J. Schindler Equip. Co.v. Raymond Co., 418 A.2d 533, 534 (1980); see also Invensys Inc. v. Am. Mfg. Corp., No. 04-3774, 2005 WL 600297, at *3 (E.D. Pa. Mar. 15, 2005) (Padova, J.) (dismissing claim arising from purchase agreement to indemnify buyer for asbestos lawsuits because no payment or judgment had been made yet for the lawsuits). "Because the right to indemnification does not arise until payment is made, the party seeking indemnity is not prejudiced by being denied the pursuit of any claim prior to that time." McClure, 585 A.2d at 23 (citing Nat'l Liberty Ins. Co. v. Kling P'Ship, 504 A.2d 1273 (1986)).

At this stage in the litigation and considering the pleadings in the light most favorable to the non-movant, the Court finds that Insignia's indemnification claims should survive the Motion. Insignia has pleaded that it suffered legal fees and losses due to Key Star's actions. Insignia also represented at oral argument that it had suffered losses and incurred fees in its attempts to ameliorate the damage and issues allegedly caused by Key Star's actions. The Court finds this sufficient, at this stage, to survive a Rule 12(b)(6) challenge. The Court will deny the Motion as to Count II of the Amended Counterclaim and Count I of the Amended Third-Party Complaint.

### B.  Extra-Contractual Claims

#### 1.  Count III:  Securities Fraud (10b-5)

Insignia also brings a federal securities fraud claim against Key Star under Rule 10b-5.
Insignia based on allegedly false and misleading statements Key Star made regarding the sale of
its common stock in TRI to Insignia.[4]

It is illegal, in connection with the purchase or sale of a security, "[t]o make any untrue
statement of a material fact or to omit to state a material fact necessary in order to make the
statements made, in the light of the circumstances under which they were made, not misleading."
17 C.F.R. § 240.10b-5(b).

Key Star argues that Insignia's 10b-5 claim fails due to the "gist of the action doctrine"
and for lacking particularity.  The Court is unpersuaded by either of these arguments.

#### i.  Gist of the Action Doctrine and 10b-5

First, Key Star argues that the "[t]he mere allegation that a contractual breach involved a
security is not sufficient to assert a 10b-5 action."  Mot. at 21.  In support of this contention, Key
Star cites to a Second Circuit case, which holds that "[b]reaches of contract generally fall outside
the scope of the securities laws."  Capital Mgmt. Select Fund Ltd. v. Bennett, 680 F.3d 214, 225
(2d Cir. 2012).  Under Second Circuit case law, such claims will only invoke securities laws
when, at the time that the contract was formed, the defendant was already planning to breach.
See Gurary v. Winehouse, 235 F.3d 792, 801 (2d Cir. 2000) ("[T]he failure to carry out a
promise made in connection with a securities transaction is normally a breach of contract and

---

[4] Counts III (securities fraud) and IV (fraud) of the Amended Counterclaim and Count II (control liability
for securities fraud) of the Amended Third-Party Complaint are not subject to the "sole remedy"
provision of the SPA as that provision applies "except for the availability of injunctive or other equitable
relief and **claims for fraud**."  See § 8.10, SPA Doc. at 50 (emphasis added).

does not justify a Rule 10b–5 action ... unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform.").

What Key Star argues for, and what the Second Circuit appears to have done in these cases, is to impute the "gist of the action" doctrine normally present for claims in common law fraud to federal securities fraud as well.  "The gist of the action doctrine is a theory under common law 'designed to maintain the conceptual distinction between breach of contract claims and tort claims.'"  Addie v. Kjaer, 737 F.3d 854, 865 (3d Cir. 2013) (quoting eToll, Inc. v. Elias/Savion Adver., Inc., 811 A.2d 10, 14 (Pa. Super. Ct. 2002)).  "The doctrine is policy-based, arising out of the concern that tort recovery should not be permitted for contractual breaches." Id. (citing Glazer v. Chandler, 200 A.2d 416, 418 (Pa. 1964)).

The Court will not bar Insignia's federal securities fraud claims based on the gist of the action doctrine.  Unlike the Second Circuit, the Third Circuit has not yet held that the doctrine, which is a creature of state tort law, should also apply to claims under 10b-5.  The Court does not intend to grow the judicial oak of Rule 10b-5 any larger than necessary.  See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 736 (1975) ("When we deal with private actions under rule 10b-5, we deal with a judicial oak which has grown from little more than a legislative acorn.").  The implied private right of action under 10b-5 and its statutory root, 15 U.S.C. § 78j(b), is plain that it is illegal to make any untrue statement in connection with the sale of any security.  Some courts have made it a habit to impute tort law doctrine into the 10b-5 analysis.  See Margaret V. Sachs, The Relevance of Tort Law Doctrines To Rule 10b-5: Should Careless Plaintiffs Be Denied Recovery?, 71 Cornell L. Rev. 96 (1985) (examining courts' imputation of tort doctrines to federal securities law over the years, although not including gist of the action).  But without applicable binding precedent, the Court sees no need to do so here.

### ii.   **10-b5 Claims Will Survive the Motion**

"It is well settled that a claim of securities fraud under Section 10(b) requires proof "that the defendant (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." GFL Advantage Fund, Ltd. v. Colkitt, 272 F.3d 189, 212 (3d Cir. 2001) (internal quotations omitted).  In contemplating a plaintiff's showing of fraud for a 10b-5 claim, courts have adopted the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure, requiring that "the circumstances constituting fraud or mistake shall be stated with particularity." See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1417 (3d Cir. 1997); Fed. R. Civ. P. 9(b); see also Beck, No. 09-1360, 2009 WL 3152184, at *7 ("Claims under § 10b–5 are subject to the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b), which means that with respect to each act or omission, a plaintiff must identify each statement alleged to have been misleading, specify the reasons why it is misleading, and state with particularity the facts that give rise to a strong inference that the defendant acted with the required state of mind.").

In the first place, Movants argue that Insignia's pleadings have not met the heightened pleading requirements required by 9(b).  Insignia argues that to meet these requirements it needs only adequately plead that Key Star had "a motive and clear opportunity" for committing fraud or that Key Star exhibited "conscious or reckless behavior" under the circumstances, citing to the Burlington Coat Factory case.  See In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1418 ("The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that

constitute strong circumstantial evidence of conscious misbehavior or recklessness."). Regarding motive and opportunity, Insignia points to Key Star's motivation to sell its shares in TRI at a favorable price while meeting production levels sufficient to attain the Earn-Out Payments and the opportunity to do both by lying about the financial status of TRI and the condition of its physical plant and by lying about how it would conduct business operations between signing and Closing.  Insignia alleges in the Amended Counterclaim that Key Star knew at the time of signing that TRI had insufficient airspace, that the leachate pond was in dire need of maintenance, and that its environmental permits were in jeopardy due to improper acceptance of waste.

Key Star asserts that there are insufficient facts in the allegations of securities fraud or common law fraud.  This topic has been extensively briefed by the parties.  Key Star is correct that, in general, courts require specificity in allegations of 10b-5 cases, including names of individuals, dates, and specific facts.  Key Star is also correct that Insignia's Counterclaim lacks these details.  The Court observes that Insignia alleges specific topics of omissions or misrepresentations but has not alleged the usually required details backing up these generalizations.

Most securities fraud cases are by individuals or entities that have purchased or sold stock in a company and have no personal knowledge of the innerworkings of a company.  However, as was made very clear during the oral argument in this case on April 4, that is not true in this case. This case arose out of very detailed negotiations among the parties, both in the formation of the SPA and in negotiations after the sale of TRI took place.  Thus, these parties are not the usual "strangers" that are litigating 10b-5 cases.

For these reasons, the Court will not require Insignia to amend its counterclaims or third-party claims but advises the parties that it will expect full and prompt detailed factual discovery by both Insignia and the Key Star.  Following the extensive negotiation referenced above, full discovery is a more efficient and less costly method of making sure both parties have all the facts. including the names of individuals who were involved in various discussions and decision making, and production of documents that are relevant on these issues, to be followed by depositions, as customary in these cases.  See In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1418 ("[T]he normally rigorous particularity rule has been relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control.").  For these reasons, the Court will deny the Motion as to Count III.[5]

### 2. Count IV:  Common Law Fraud

Insignia also makes a claim of common law fraud under the same allegations as that of its securities fraud claim.  While pleaded as a "Fraud" claim in the Amended Counterclaim, the Court understands Count IV to refer to alleged misrepresentations from the SPA that occurred both before and after signing, with the before-signing allegations sounding in fraudulent inducement.

Unlike Insignia's securities fraud claims, its common law fraud claims are subject to the gist of the action doctrine, with Key Star arguing that the fraud claims are duplicative of the contract claims and should be dismissed.  "Generally, courts apply the gist of the action doctrine when the claims are (1) arising solely from a contract between the parties; (2) where the duties

---

[5] Because a claim based on the control liability theory requires underlying liability, the Court will deny the Motion as to Count II of the Amended Third-Party Complaint as well.  See Belmont v. MB Inv. Partners, Inc., 708 F.3d 470, 484 (3d Cir. 2013) ("[P]laintiffs must prove not only that one person controlled another person, but also that the 'controlled person' is liable under the Exchange Act.") (internal quotations omitted).

allegedly breached were created and grounded in the contract itself; (3) where liability stems

from a contract; or (4) where the tort claim essentially duplicates a breach of contact claim or the

success of which is wholly dependent on the terms of a contract." Addie, 737 F.3d at 865

(quoting eToll, Inc. v. Elias/Savion Adver., Inc., 811 A.2d 10, 19 (Pa. Super. Ct. 2002)).

Many of Insignia's fraud allegations are rooted in the representations Key Star made in

the SPA, and so were made by Key Star and relied on by Insignia at the time of signing.  These

include Key Star's representations regarding TRI's financial condition and the condition of

TRI's waste facility.  Because they were memorialized in the SPA, Key Star's liability for those

post-contract representations arises solely from the contract.  Therefore, those allegations are

clearly precluded under the gist of the action doctrine.

However, Insignia also makes certain fraud allegations that sound in fraudulent

inducement.  See Maguire v. Wheeler, 150 A. 882, 884 (Pa. 1930) ("Where the person making

the promise under such circumstances intended at the time not to perform it, thus fraudulently

making use of the promise as a device to procure the contract or deed, equity will grant relief.").

These include allegations that Insignia failed to disclose the leachate pond issue, the airspace

issue, and pre-existing regulatory violations at the time of signing.  These allegations are not

precluded by the gist of the action doctrine because by their timing pre-contract they are

considered independent of the contract terms themselves.  See SodexoMAGIC, LLC v. Drexel

Univ., 24 4th 183, 217 (3d Cir. 2022) ("The gist of the action doctrine does not apply here

because [a] fraudulent inducement claim does not depend on the breach of a contractual duty.").

For the same reasons set forth in Section V.B.1.ii of this decision, the Court will deny the

Motion as to Count IV of the Amended Counterclaim.

### C.  **The Shareholders Are Improper Defendants**

Movants correctly argue that the Shareholders were improperly impleaded through Insignia's third-party complaint.  Rule 14(1) provides: A defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it.  Fed. R. Civ. P. 14(1).  Insignia correctly points out that according to the SPA, the Shareholders as indemnitors are liable to indemnify Insignia by subtracting from the owed Earn-out payments.  See § 8.06(b), SPA Doc. at 48.  However, this does not mean that the Shareholders "may be liable" for Insignia's failure to pay the second Earn-Out Payment, of which no facts were pleaded, leading to improper impleader.  As indemnitors, the Shareholders are likely central to any of Insignia's surviving claims, but Insignia must derive another method to join them into this litigation.

For this reason, Insignia's Amended Third-Party Complaint will be dismissed without prejudice, with leave to file amended pleadings as to the Shareholder Defendants.

### VI.    **CONCLUSION**

For the reasons set forth above, the Court will deny the Motion as to all claims in the Amended Counterclaim and grant the Motion without prejudice as to the Amended Third-Party Complaint.

An appropriate order follows.